UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

WILLIAM G. STEVENS,

PLAINTIFF,

v.

MASSACHUSETTS DEPARTMENT OF CORRECTION,
KATHLEEN DENNEHY,
ROBERT MURPHY,
ROBERT J. WAITKEVICH,
JOSEPH MURPHY,
JOHN RULL,
GLENN EDINGTON,
OFFICER SHARPLES,
CLAUDE LEVESQUE,
NATALIA PUSHKINA,
OFFCIER MORETON,
ALLISON HALLATT,
ROY ANDRE,
WILLIAM SEARS,

**05-11505JLT**
Referred to MJ RB Collings

DEFENDANTS.

## COMPLAINT

### INTRODUCTION

1.   The plaintiff, William G. Stevens, is being detained
at the Nemansket Correctional Center, under the care and control
of the defendants. The plaintiff has not been committed as
a Sexually Dangerous Person pursuant to M.G.L. c. 123A, but
is instead awaiting a trial to decide dangerousness.   The plaintiff
has been held prisoner at this facility in excess of 17 months
since the completion of his criminal sentence.   The defendants
are violating the plaintiff's rights under: the First Amendment
of the United States Constitution and 42 U.S.C.A. § 2000cc by
interfering with and imposing a substantial burden on the
plaintiff's practice of his religious beliefs, and his right
to send and receive mail; and the Fifth and Fourteenth

Amendments of the United States Constitution and 42 U.S.C.A.
§ 1320d by refusing to provide treatment unless the plaintiff
waives his right not to incriminate himself to have confidential
treatment; the Fourteenth Amendment to the United States Constitution
for : holding him in conditions more restrictive than the prison
to which he was sentenced by the criminal court; for failing
to provide more than the minimun standards of fitness for human
habitation; and violating the plaintiff's right to personal
security.  The defendants are also violating the palintiff's
civil rights by failing to follow the statutes and laws of the
Commonwealth of Massachusetts, as well as failing to follow
their own promulgated regulations.  The palintiff brings this
action for damages and injunctive relief for violations of his
civil rights pursuant to 42 U.S.C., § 1983.

## JURISDICTION

2.  This court has jurisdiction of the subject matter of
this case under 28 U.S.C., § 1343 and 1367, including pendant
and supplemental jurisdiction over claims under the Massachusetts
General Laws, Chapter 231A, which claims are so related to the
claims under § 1343, that they form part  of the same case or
controversy.

## PARTIES

3.  The plaintiff, William G. Stevens (Stevens), is a civil
detainee, who is comorant at the Nemansket Correctional Center
at 30 Administration Road , Bridgewater, Plymouth County,
Massachusetts 02324

(DOC), is a department of the Commonwealth of Massachusetts and a "government" within the meaning of 42 U.S.C., § 2000cc, with its principal place of business at 50 Maple Street, Suite 3, Milford, Worcester County, Massachusetts 01757. The Department of Correction receives federal funding, is being sued in its official capacity only, and the plaintiff seeks only injunctive relief against the department.

5. The defendant, Kathleen Dennehy (Dennehy), is a natural person, who is the Commissioner of the Massachusetts Department of Correction, 50 Maple Street, Suite 3, Milford, Worcester County, Massachusetts 01757.

6. The defendant, Robert Murphy (R.Murphy), is a natural person, who is the Superintendent of the Nemansket Correctional Center at 30 Administration Road, Bridgewater, Plymouth County, Massachusetts 02324.

7. The defendant, Robert J. Waitkevich (Waitkevich), is a natural person, who is the Deputy Superintendent of Operations of the Nemansket Correctional Center, at 30 Administration Road, Bridgewater, Plymouth County, Massachusetts 02324.

8. The defendant, Joseph Murphy (J.Murphy), is a natural person, who is the Deputy Superintendent of Treatment/Classification of the Nemansket Correctional Center at 30 Administration Road, Bridgewater, Plymouth County, Massachusetts 02324.

9. The defendant, John Rull (Rull), is a natural person, who is the Administrative Captain of the Nemansket Correctional Center at 30 Administration Road, Bridgewater, Plymouth County, Massachusetts 02324

10. The defendant, Glenn Edington (Edington), is a natural

person, who is the Institutional Grievance Coordinator of the
Nemansket Correctional Center at 30 Administration Road,
Bridgewater, Plymouth County, Massachusetts 02324.

11.   The defendant, Corrections Officer Sharples (Sharples)
is a natural person, who is the mail officer for the Nemansket
Correctional Center at 30 Administration Road, Bridgewater,
Plymouth County, Massachusetts 02324.

12.   The defendant, Claude Levesque (Levesque), is a natural
person, who is the booking officer for the Nemansket Correctional
Center at 30 Administration Road, Bridgewater, Plymouth County,
Massachusetts 02324.

13.   The defendant, Natalya Pushkina (Pushkina), is a
natural person, who is the librarian for the inmate library
at the Nemansket Correctional Center at 30 Administration Road,
Bridgewater,  Plymouth County, Massachusetts 02324.

14.   The defendant, Corrections Officer Moreton (Moreton),
is a natural person, who is a correctional officer at the
Nemansket Correctional Center,  30 Administration Road, Bridgewater
Plymouth County, Massachusetts 02324.

15.   The defendant, Allison Hallett (Hallett), is a natural
person, who is Director of Program Services Division of the
Massachusetts Department of Correction at 50 Maple Street, Milford,
Worcester County, Massachusetts 01757.

16.   The defendant, Roy Andre (Andre), is a natural person,
who is a transportation officer for the Massachusetts Department
of Correction at 50 Maple Street, Milford, Worcester County,
Massachusetts 01757.

17.   The defendant, William "Billy" Sears (Sears), is a
natural person, who is Director of Food Services for the

Bridgewater Complex at 50 Maple Street, Milford, Worcester County
Massachusetts 01757.

18.   Each of the individual defendants is sued in both
their official and individual capacity.

19.   At all times relevant to this action each of the
defendants was acting under the color of state law.

STATEMENT OF FACTS

20.   On September 1, 1999, Stevens pled guilty to two sexual
offenses in the Barnstable Superior Court and was sentenced
to six (6) years to six years one (1) day in prison.

21.   Stevens served the majority of his sentence at N.C.C.I.
Gardner (NCCI), a level 4 medium security prison.

22.   On January 30, 2004 the Barnstable County District
Attorney filed a petition to have Stevens civilly committed
as a Sexually Dangerous Person, pursuant to M.G.L. c. 123A,
one (1) day before Stevens would have completed his prison
sentence.

23.   On January 31, 2004 Stevens' prison sentence was
completed.

24.   Stevens has, since January 30, 2004, been held at
the Nemansket Correctional Center in Bridgewater.

COUNT I - LEAST RESTRICTIVE ALTERNATIVE

25.   The defendants are holding Stevens in conditions of
confinement which far exceed the least restrictive alternative,
and which are substantially more restrictive and punitive than
the conditions under which Stevens was held while in prison.

26.   Stevens is being held in a cell, which was designed

for one person, with another prisoner who is, potentially, facing a lifetime commitment as a sexually dangerous person.

27.   The cell in which Stevens is held, as originally designed, contained a 36" wide spring bed, a 4 drawer faux wood desk with a chair, a 4 drawer faux wood dresser, and a faux wood wardrobe which provided a combined total of 43 cubic feet of storage space, an additional 3 cubic feet of secured storage was provided by a foot locker. The defendants have caused the bed to be replaced by a 27" wide, steel plate, bunkbed; the desk and chair to be replaced with a much smaller steel "prison" desk; and the wardrobe and dresser to be replaced by a 3 cubic foot storage locker.

28.   At NCCI Stevens had adequate storage space that far exceeds the 6 cubic feet he is currently provided.

29.   At NCCI Stevens had access to the law library 39 hours per week. At the Nemansket Correctional Center the law library is open for a maximum of 10.5 hours per week for civil detainees. Because movement is often substantially delayed, the library is often closed for staffing reasons and because the library's limited capacity of 23 is often reached before Stevens can get there, the actual number of hours the law library is available to Stevens is often less.

30.   At NCCI, Stevens had access to the yard 49 hours per week. At the Nemansket Correctional Center Stevens has access to the yard up to 18.5 hours per week.

31.   The two (2) yards at NCCI held a combined total of 2 running tracks, a softball field, 3 basketball courts, 3 horseshoe pits, 6 sets of various workout bars, a bocci pit,

2 handball courts, and numerous benches and picnic tables for
prisoners to sit at and read or play games. At Nemansket Correctional
Center there is only one running track, 2 basketball courts,
and 1 handball court. There are no benches, bleachers, or picnic
tables in the yard and prisoners are prohibited from bringing
books, papers, games, and magazines to the yard.

32. At the Nemansket Correctional Center, Stevens is
restricted as to the size of portable radio he can bring to
the yard. This was not the case at NCCI.

33. At the Nemansket Correctional Center, there are no
bathroom facilities available to Stevens from the yard and he
is only allowed egress from the yard during scheduled movements.
At NCCI, Stevens had unrestricted access to bathroom facilities
from the yard.

34. At NCCI, a level 4 prison with a substantial proportion
of sex offender prisoners, Stevens had access to prisoner
vegetable gardens, and an ice cream "shack" that sells ice cream
and soft drinks to prisoners, there were also numerous trees
and inmate tended flower gardens in the yard and on the grounds.
At the Nemansket Correctional Center, there is not a single
flower, shrub or tree in areas accessable to prisoners, and
in the winter time prisoners are rarely allowed access to snow
shovels so the track frequently remains unusable.

35. At NCCI, Stevens had access to the gym 39 hours per
week. At the Nemansket Correctional Center, Stevens has access
to the gym 15 hours per week and this amount is frequently further
limited due to ineffective staffing and delayed movements.

36. At NCCI, the gyms (2) contained extensive free weights
and cardio vascular exerci.. .                         .. as areas when

and cardio-vascular exercise machines, as well as areas where prisoners could bring games and paperwork to occupy their time as well as radios to listen to. At the Nemansket Correctional Center, there are no free weights, no cardio-vascular exercise machines and Stevens is not allowed to bring anything to the gym.

37. At the Nemansket Correctional Center, there are 5 pages of detailed rules for prisoners and visitors, failure to comply with any of them can cause denial or cancelation of the visit. If the visitor arrives after the scheduled movement has been completed, the visitor will be made to wait up to 50 minutes before the prisoner is allowed access to the visiting room. Prisoners are frequently required to wait as long or more after the departure of their visitors before being "processed" to leave the visiting room. At NCCI prisoners are allowed access to the visiting room immediately upon the arrival of their visitor and immediate egress from the visiting room when their visitor leaves.

38. Stevens is restricted to purchasing the same food, clothing and appliances at the Nemansket Correctional Center as all inmates at level 4 prisons can purchase; despite the fact that several companies (Sears and J.C. Pennys, etc.) provide mail order sales, and yet others (Access and J.L. Marcus, etc) provide a wide range of clothing and appliances suitable for secure facilities. At M.C.I. Norfolk, a comparable level 4 facility, prisoners can purchase hamburger, chicken, onions, peppers, garlic, oranges, bananas, apples, pancake mix, flour and Crisco oil Stevens can not purchase any of these items at

the Nemansket Correctional Center.

39.   At NCCI, Stevens was not limited to the frequency
at which he was allowed to purchase clothing and appliances
including typewriter ribbons.  At the Nemansket Correctional
Center, Stevens is restricted to making one order per 90 day
period, a time period frequently extended by the institutional
property officer refusing to process orders in a timely manner.

40.   The Nemansket Correctional Center has previously
allowed food, clothing and appliances to be sent into the facility
from outside vendors and family members without jeopardizing
the mission of the Massachusetts Treatment Center, or the security
of its personel.

41.   At NCCI, there were a substantial number of prisoners
(40), working in prison industries, where they could earn up
to $65.00 per week.  At the Nemansket Correctional Center, there
are only 15 industries job slots which earn a maximum of $2.00
per day.

42.   The Nemansket Correctional Center has in the past
allowed prisoners to suplement their limited incomes by producing
craft items in their cells or by constructing wood products
in the woodshop for sale to employees, family members or friends.
Though there is still an operating woodshop it is limited to
production of items for DOC employees only and prisoners can
no longer enjoy a financial profit from their work, nor can
they engage in craft work for outside sale.

43.   At NCCI, Stevens was able to participate in
vocational programs including: welding, small engine repair,
horticulture, food service and barber school.  At the Nemansket

Correctional Center, there are no educational programs beyond
the G.E.D. program.

44. At the Nemansket Correctional Center, there is a so
called "computer lab" to which access is severly limited due
to the defendants cutting access time by 50% to accomodate
state prisoners and nearly doubling the institutional population.
At best Stevens could secure a 30 minute time slot once per
week, that access would be further reduced by the amount of
time it takes to reach the lab area, stand in line to be
subjected to a pat down search, sign into the lab, and log on
to the archaic computer system all of which reduces the useable
computer time to 10 - 15 minutes per week. This is all contingent
upon Stevens' ability to secure a time slot which is assigned
on a first come first serve basis with civil detainees like
Stevens being the last to be assigned access. If Stevens attempts
to do legal work on these computers he will lose what little
access he may have.

45. On information and belief other state hospitals allow
limited access to the internet for information searches, legal
research or to just "surf the net". None of these activities
are available to Stevens although internet access is provided
for security staff to amuse themselves while on duty.

46. At NCCI, Stevens' job allowed him access to word
processors and computers. Prisoners who were housed at the
Nemansket Correctional Center prior to 1997 were allowed to
purchase, and are still allowed to keep, personal computers
and printers in their cells while all "new" (post 1997) detainees
and prisoners are limited to plain electric typewriters without

spell check or memory and are frequently unable to use even those due to their orders for ribbons not being processed in a timely manner. Requests to the Superintendent for the permission to purchase a computer are currently going unanswered or being denied.

47.   At NCCI, all of the showers used by Stevens had standard shower controls which allowed for the adjustment of water temperature and the uninterupted flow of water for the entire shower. At the Nemansket Correctional Center all showers have a push button control which provides water for only 10 - 20 seconds duration and often the water is uncomfortably hot or cold.

48.   At NCCI, the chow hall was large enough to accomodate the inmate population while allowing sufficient time to complete the meal without rushing. At the Nemansket Correctional Center, there are not enough tables to seat even a small portion of the population - at its current level, a population that continues to increase. Prisoners are herded through the chow hall, euphemistically refered to as the Inmate Dining Room (IDR), at a rate that doesn't allow the minimum allotted 20 minutes for prisoners to eat. Stevens and other prisoners are often forced to consume a portion of their meals while standing because there are no available seats, which in turn causes the guards to begin yelling for the prisoners to move out even more quickly.

49.   The regulations and restrictions that apply to criminals, whose conditions of confinement are designed to punish, are applied to Stevens despite the holding of Youngberg v. Romeo, 457 U.S. 307 (1982), which entitles Stevens to more considerate treatment and conditions of confinement than afforded criminals whose confinement is designed to punish. It has been Stevens'

experience that these regulations, set out in Title 103 of the
Code of Massachusetts Regulations, are more zealously enforced
in the Nemansket Correctional Center than at other facilities
Stevens has been confined to.

50.  The Nemansket Correctional Center has enacted and
enforces an enhanced version of the Code of Massachusetts Regulations,
called MTCs.  These enhanced CMRs are enacted and enforced without
being promulgated in accordance with the state's administrative
procedures act, M.G.L. c. 30A.

51.  At NCCI, as well as other prisons, there is some form
of inmate council which is, at least to a limited extent, allowed
to advocate on behalf of the prisoners. No such group exists
at the Nemansket Correctional Center.

52.  At the Nemansket Correctional Center, all "new" (post
1997) prisoners, including Stevens, are not allowed to purchase
reading lamps, while "old" (pre 1997) prisoners who had lamps
are allowed to keep them.  The cell Stevens is confined to is
lit by a single 2 bulb, four foot florescent fixture mounted
in the center of the ceiling in a position that causes the top
bunk to block the light from the bottom bunk.  In addition when
Stevens has been housed in a top bunk he has had the light
glaring into his eyes from less than three feet away.  The
existing lighting was not designed for the instalation of bunk
beds and is inadequate for the bottom bunk and overwhelming
on the top bunk.

## COUNT II - FAILURE TO PROVIDE THE MINIMAL
## CIVILIZED MEASURE OF LIFE'S NECESSITIES

53.  The Massachusetts Department of Public Health has

promulgated regulations which prescribe mandatory minimum standards
of fitness for human habitation at 105 CMR 410.  These provide
the "minimal civilized measure of life's necessities" and apply
to all dwelling units, unless otherwise provided for in the
code.  Correctional facilities operated by the DOC are not subject
to the less restrictive, mandatory, standards of 105 CMR 410,
but the more restrictive conditions recomended by 105 CMR 451.
The Supreme Judicial Court has recently reaffirmed that the
Nemansket Correctional Center, dispite its name, is a "secure
mental health facility" not a "correctional facility".
Commonwealth v. Knapp, 441 Mass. 157, 168, 804 N.E. 2d. 885,
894 (2004), citing Doe v. Gaughan, 808 F.2d 871, 879 (1st Cir.
1986).

54.    105 CMR 410 provides in the relevant part that:

### 410.440 Minimum Square Footage

(A) Every dwelling unit shall contain at least 150
square feet of floor space for the first occupant,
and at least 100 square feet of floor space for each
additional occupant, the floor space to be calculated
on the basis of total habitable room area.
(B) In a dwelling unit, every room occupied for sleeping
purposes by one occupant shall contain at least 70
square feet of floor space; every room occupied for
sleeping purposes by more than one occupant shall
contain at least 50 square feet of floor space for
each occupant.

55.    The recomended minimum space standards for correctional

facilities as provided by 105 CMR 451 are:

### 451.320 Cell Size: Existing Facilities

Each cell or sleeping area in an existing facility
should contain at least 60 square feet of floor space
for each occupant, calculated on the basis of total
habitable room area, which does not include areas
where floor to ceiling height is less than eight (8)
feet.

### 451.321 Cell Size in a New or Renovated Facility

> Each cell in a new facility or a part of a facility
> constructed after the effective date of 105 CMR
> 451.0000 should contain:
>
> (A) For segregation and special management areas
> where inmates are usually locked in for greater than
> ten (10) hours per day, at least 80 square feet of
> floor space for a single inmate.
>
> (B) For inmates usually locked in for less than ten
> (10) hours per day, at least 70 square feet of floor
> space for a single inmate. Provide, however, two
> inmates may occupy a room or cell designed for double
> occupancy which has a floor space of 120 square feet.

56. Stevens is double bunked in a cell that contains 80 square feet of floor space. If one deducts the areas where the floor to ceiling height is less than 8 feet, Id at 451.320, due to perminantly attached bunk beds, desk, toilet and wash basin, there is less than 57 square feet of habitable room area in the cell Stevens is forced to occupy with another potentially sexually dangerous inmate.

57. Stevens is secured in his cell with the other occupant a minimum of 12.5 hours per day which effectively defines the area as being for segregation or special management purposes. Id at 451.321(A).

58. For the purposes of 105 CMR 410.440 and 105 CMR 451.320&321 the defendants are not providing Stevens with the minimal civilized measure of life's necessities for a "secure mental health facility" or a "correctional facility" with regard to square feet of floor space.

59. 105 CMR 451.112 provides that:

> Each inmate and each employee shall have access to
> a toilet and handwashing sink at all times.

60. Stevens and all other prisoners at the Nemansket Correctional Center have no access to a toilet when they are

in the yard.  Stevens has experienced extreme discomfort as a result of the lack of toilet access and his refusal to debase himself and simply relieve himself against the fence – a practice followed by other prisoners and dogs.

61.  Over six (6) years ago the court in King v. Greenblatt, 53 F. Supp. 2d 117, 134 (D. Mass. 1999) noted:

"To be sure, there are issues in the day to day management of the Treatment Center.  Funds are being sought from capital planning funds to install toilet facilities accessable to the yard to attempt to address the resident's complaint about lack of toilet facilities in the yard."

62.  Stevens and all other prisoners at the Nemansket Correctional Center who are unable to purchase clothing through the inmate canteen are issued the same clothing issued to level 6 , super maximum security prison inmates; 2 – grey, rough poly/cotton blend 2 piece jump suits with DOC blazened across the back in 6 inch letters and undergarments that are illfitting and lacking a fly opening.  On information and belief other state hospitals issue state manufactured blue jeans and button up shirts to their residents.  By providing clothing that is designed to dehumanize the wearer the defendants are failing to provide more than the barest minimal measure of life's necessities.

## COUNT III – TELEPHONES

63.  At the Nemansket Correctional Center, as well as all other correctional facilities run by the DOC, all telephone calls made by Stevens and all other prisoners are subject to monitoring and recording.  A recorded announcement interupts the call approximately every 8 – 10 minutes to announce that "this call is from a correctional facility and is subject to

monitoring and recording."

64. Stevens is limited to a pre-authorized list of 15 phone numbers; 5 attorney numbers and 10 other persons to whom calls can be made. The primary home phone numbers of Stevens' immediate family; mother, father, sister and step siblings alone total 11 numbers, this does not include grandparents, Aunts, Uncles or cousins. Stevens may only update his preapproved phone list once every three months.

65. All phone calls made by Stevens and all other prisoners at the Nemansket Correctional Center must be made collect using a carrier under contract to the DOC.

66. The rates charged by the carrier are substantially more expensive than those paid by the general public, particularly compared to the rates charged when using a pre-paid phone card.

67. For each call Stevens makes to family members, none of which are within the Commonwealth of Massachusetts, the cost of the call is $3.69 for the first minute and $.69 for each additional minute using the DOC carrier. The calls are further limited to 30 minutes requiring that the $3.69 cost of the first minute be re-paid each time the 30 minute limit expires.

68. Under the contract with the carrier and regulations of the DOC the carrier pays a commission on telephone tolls paid by Stevens and other prisoners directly into the General Fund of the Commonwealth of Massachusetts.

69. There is no authorization in the General Laws of Massachusetts for a commission to be charged prisoners for collect phone calls and to be paid into the General Fund.

70. Limiting the number of persons Stevens may call, the

duration of those calls, not allowing the use of custom calling features and the monitoring and recording of those calls is more restrictive than justified by any compelling government interest.

71. On information and belief other state hospitals allow their residents to possess cellular phones as well as pre-paid calling cards. No such options are available to Stevens at the Nemansket Correctional Center.

## COUNT IV - MAIL

72. The defendants have enacted a series of policies (MTCs) that they strictly enforce. In this particular instance an "attachment" to 103 CMR 481 which allows the Nemansket Correctional Center additional controls on prisoner mail.

73. The mail of civilly committed, mentally ill persons is not controlled by the more restrictive 103 CMR 481, but by M.G.L. c. 123, § 23(b) which gives the right to "send and receive sealed, unopened, uncensored mail". The defendants refuse to honor that right.

74. The defendants have violated Stevens' First Amendment right to receive mail. In an effort to aid in his defense against civil commitment under c. 123A Stevens has had copies of relevant case law sent from Westlaw and other sites downloaded by his father and mailed to him at the Nemansket Correctional Center.

75. Stevens has received the first 5 pages of these mailings with notice that the balance of the case copies were "Disapproved Correspondence/Publication and Contraband" with the explaination "photocopies (5 pages maximum)" and check marked on the list

of "Reason(s) for Disapproval/Non-Delivery": "Item(s) not
authorized by 103 CMR 403, Inmate property policy".

76.   There is no property regulation or any other regulation
which prohibits an inmate from receiving or retaining copies
of legal cases and decisions, nor is there any regulation
restricting the source of legal/research documents.

77.   On June 16, 2005 Stevens received a notice in the
inmate mail from the mail officer.  This notice appears to be
a photocopied page dated December 2004 and titled "Attachment
to 103 CMR 481-2".  A section had been highlighted by the sender
which read "Internal mail/correspondence sent by an inmate/resident
      to a staff member or department within the facility or
      on the Bridgewater Complex, will be handled as follows:

      a.   Envelopes will not be allowed.

78.   Stevens frequently sends mail to officials at the
Nemansket Correctional Center, these missives are, to some extent
confidential correspondence between the addressee and the plaintiff,
and idefinately not for the casual purusal of whoever comes
into contact with the mail.

79.   On June 30, 2005, Stevens attempted to serve copies
of legal documents on Mary P. Murray, Esq., "Supervising Counsel
for the DOC at the Massachusetts Treatment Center" through the
"Inter-Institutional Mail".  The documents were placed in an
unsealed envelope clearly addressed and labeled "Legal Mail"
with  Stevens' full return address.  This is the same manner
in which Ms. Murray had served Stevens the previous day.  The
officer "guarding" the mail boxes refused to allow Stevens to
send the legal mail.

80.   There is no rational basis for treating Stevens more

restrictively than persons who have been civilly committed to
mental hospitalsbecause they present imminent danger to themselves
or others.

81.   Stevens frequently has reason to mail items "certified"
and "return receipt", the defendants have consistantly failed
to provide Stevens with the certified mail receipt after the
U.S. Post Office has placed its cancelation stamp on it.   A
service Stevens has paid for in every instance.

82.   At NCCI, Stevens could freely exchange newspapers
and magazines received through the U.S. Mail with other prisoners.
At the Nemansket Correctional Center, Stevens is subject to
disciplinary action for doing so.

## COUNT V - GRIEVANCES

83.   The defendants have failed to provide Stevens with
a fair, impartial, speedy and effective grievance process pursuant
to M.G.L. c. 127, § 38E.

84.   The Institutional Grievance Coordinator (IGC), Glenn
Edington, is frequently moved to other job locations within
the institution, this combined with the DOC's new grievance
policy of entering each grievance into the Inmate Management
System (IMS) computer causes Stevens to be subjected to substantial
delays between the time that he places a grievance in the
institutional mail, the approved method of filing grievances,
and notification that the grievance has been received by the
IGC.

85.   Stevens is frequently subjected to further delays
in the timely processing of his grievances by the IGC due to
the defendant issuing himself an unlimited amount of ten (10)
day extentions.   103 CMR 491.18 allows for a ten day extention

to be granted by the "Superintendent or his designee". By frequently issuing 2 to 3 extentions at a time the defendants are clearly acting outside the scope of this prison regulation, which should not apply to Stevens in the first place since he is not a prisoner.

86.   Stevens has been denied an effective grievance process due to the defendants' failure to enforce the few grievances that were decided in Stevens' favor, and the fact that the IGC will not over rule clearly illegal actions of his superiors, or clearly illegal institutional policies or procedures.

87.   Stevens has brought this non-compliance with the decisions of the IGC to the attention of the defendants through the grievance process and at staff access.

88.   The defendants have taken no action to rectify the non-compliance with G.L. c. 127, section 38E and abuse of 103 CMR 491.18 issues, even though specifically asked to by Stevens.

## COUNT VI - ACCESS TO THE LAW LIBRARY

89.   Stevens' access to the law library at the Nemasket Correctional Center is frequently denied due to library closure or the library reaching its physical capacity of 23 prisoners.

90.   At the Nemasket Correctional Center, the law library and general library are combined into a single, over crowded room.   This limits the total number of prisoners who can access the library, both law and general, to 23 prisoners at any given time.   This was not the case at NCCI, where the law library alone exceeded the square footage of the entire combined library at the Nemasket Correctional Center.   The space provided is clearly inadequate to house both the law library and general library.

91.  At the Nemansket Correctional Center, Stevens must check out all law books for use within the library.  Only one (1) prisoner is allowed in each aisle of books at a time and prisoners are not allowed to scan through books such as Shepard's Citations at the book shelves, but must sign out the book and return to his work table.  This was not the case at NCCI where the law library was set up to facilitate legal research.

92.  At NCCI, Stevens had almost 4X as much access to the law library as he now does, and could obtain copies of legal cases and procedings to facilitate additional legal work in his living area.  This is not the case at the Nemansket Correctional Center.

93.  On February 17, 2004, Stevens submitted material for copying to defendant Pushkina.  These materials included motions and pleadings of attorneys of established competence in the field of M.G.L. c. 123A defense, which Stevens intended to mail to his attorney who had never done any work in this field previously.

94.  On March 16, 2004, Stevens submitted a copy of the United States Supreme Court's decision in Crawford v. Washington, to Pushkina.

95.  In both instances Pushkina refused to make copies for Stevens, citing 103 MTC VIII, et seq which provides in the relevant parts that: "Materials other than a prisoners own legal work will not be copied" and "Legal book materials will not be copied".

96.  Stevens verbally and through the grievance process, made the defendants aware that 103 CMR 478.11(4)(a), which has

the force of law provides that:

> "Photocopying services shall be for the purpose of
> duplicating original legal documents and for the purpose
> of increasing access to the libraries collection."

Although this prison regulation should not apply to Stevens
because he is not a prisoner. The defendants continued to refusée
copies.

97.   Pushkina refuses to provide copies of grievances,
personal and official correspondences as well as the policies
and regulations which apply to Stevens.

98.   Stevens has a constitutionally protected right of
access to the courts, Bounds v. Smith, 430 U.S. 817, 828 (1977).
In Bounds the Supreme Court affirmed a district court order
which included providing a copier as part of law library services
for prisoners. By interfering with Stevens' ability to research
and copy legal materials the defendants are imparing his meaningful
access to the courts.

99.   Stevens is further frequently denied the ability to
have "approved" legal copies made due to R.Murphy's refusal
to designate more than one (1) staff member as responsible for
photocopies as provided in 103 CMR 478.11(4). As an example
for the month of June 2005 Stevens was unable to have legal
copies made 18 of 30 calandar days.

100.   The policy, 103 MTC VII, that defendants R.Murphy
and Pushkina cite in support of their refusal to make legal
copies, purports to have been approved by Dennehy.

## COUNT VII - RECKLESS ENDANGERMENT

101.   Stevens has the right to personal security which
constitutes an historic liberty interest protected substantively

by the due process clause of the Fourteenth Amendment, that right is not extinguished by lawful confinement, even for penal purposes, and, it is similarly unconstitutional to confine the involuntarily committed who may not be punished at all, in unsafe conditions.

102.   On March 3, 2005, Stevens was transported to Barnstable Superior Court, some 40 to 50 miles in a dilapidated state van. The van had no windows ventilation, and no seats or seatbelts, only wooden benches running along the sides of the van.   When Stevens requested that some way be devised to secure him in the van so that he would not be bounced around the back of the van, it was suggested by defendant Levesque that the state transport officer "super glue" Stevens' ass to the bench.

103.   Though Stevens was handcuffed, belly chained and in leg irons, with no means to brace himself, the transport driver operated the vehicle in such a manner so as to cause Stevens extreme discomfort.

104.   Stevens grieved this action and no action was taken.

105.   On April 25, 2005, Stevens was transported from Lemuel Shattuck hospital by defendant Andre, who operated the state van in a dangerous manner, reaching speeds of 90 mph on the highway and 60 mph in residential areas, frequent and erratic lane changes, abrupt accelerations and decelerations and engaged in behavior that can only be described as "road rage".

106.   Prior to the April 25, 2005 transport, Stevens had smelled alcohol on the breath of Andre as well as the smell of alcohol sweating out of his pores.   On these occasions Andre was obviously hungover if not still intoxicated.   As a result Stevens felt in fear for his safety with this officer.

107.  On April 28, 2005, Stevens was again scheduled to
be seen at Shattuck hospital.  Stevens informed the booking
officer, defendant Levesque, that if Andre was the transportation
driver he would refuse to be transported.

108.  The officer assigned was again Andre, who, when
informed of Stevens' refusal, came at Stevens in an agressive
manner and began to verbally assult Stevens.  Through the course
of this attack Stevens could smell alcohol on Andre.

109.  Defendant Levesque wrote an "observation report"
on Stevens for exercising his right to personal safety.  The
report accused Stevens of "conduct which disrupts or interferes
with the security or orderly running of the institution" for
which Stevens was sentenced to a week loss of yard access.
No reference was made of officer Andre's condition or behavior
during this incident.

110.  Stevens grieved the conduct of Andre on April 28,
2005, but as of July 11, 2005 has yet to receive a response.

111.  On May 23, 2005, Stevens was scheduled to be seen
at Shattuck hospital.  Stevens again informed Levesque that
he would not subject himself to the verbal assult or dangerous
road rage of officer Andre.  Stevens was returned to his cell
before any further altercation with Andre could occur.

112.  Officer Levesque wrote another "observation report"
to which Stevens was sentenced to two (2) weeks loss of canteen
privileges.

113.  On May 26, 2005, Stevens was transported to Shattuck
hospital without incident.  When leaving the holding tank in
handcuffs, bellychains, and leg irons Stevens observed Andre
waiting with the transportation orders.  As Stevens was

shuffeling down the hallway towards the exit door Andre came
up behind Stevens and said "That's how easy to get you are you
piece of shit", then either brushed against Stevens or pushed
Stevens from behind causing him to stumble against the wall.

114. At all times that Stevens was transported in vans
since his arrival at the Nemansket Correctional Center, that
transportation has been in vans without seatbelts by drivers
with little or no regard for state traffic laws. Despite the
holding in McAfee v. Overberg, 367 N.E. 2d 942 which provides
for ...[A] "safe and adequate means of transportation."

115. Stevens has on numerous occasions been transported to
Shattuck Hospital while chained to state inmates then locked
in the holding cells with state inmates, despite St. 1990, c.
150, section 104 which provides that ..."[T]reatment [C]enter
patients shall at all times remain seperate and apart from [DOC]
inmates.

116. Stevens has grieved this situation and his grevience
was denied stating that "DOC has the authority to transport
and house together the Civilly Committed and State Inmate
populations, during outside transportation trips". Stevens
was unable to find this amendment to the statute.

117. In June, 2005 defendant Rull ordered all chairs
removed from prisoners cells, at this time Rull also ordered
Stevens to comply with the new Nemansket Correctional Center
policy and place three of the cells footlockers under the bunk
and not place the fourth at the foot of the bunk.

118. Stevens pointed out that the new policy left no safe
way for Stevens to access the top bunk. It is now necessary

for Stevens to climb up on his toilet seat and from their up
on to the $\frac{1}{2}$" wide lip of his handwashing basin, then to launch
his 250 lb frame across a 30" wide chasm between the bunk and
edge of the sink. Stevens further informed Rull that comming
down was even a riskier proposition as Stevens must attempt
to find footing on the edge of the basin from the top bunk without
the aid of his eyeglasses. Mounting and dismounting the bunk
in this manner has already caused the bunk to come loose from
the wall allowing it to rock in a dangerous manner.

120.  To increase the floor space of a cell in the
Nemansket Correctional Center by 2.25 square feet per locker
in the hope of reaching the hoped for 60 square feet the defendants
are willing to risk the personal safety of Stevens by ordering
that the footlockers Stevens previously used as steps to facilitate
access to the top bunk be kept under the bunk.

## COUNT VIII - STRIP SEARCHES

121.  The defendants have promulgated policies where-by
Stevens is frequently subjected to strip searches without an
"individualized and reasonable suspicion that he is carrying
contraband." Shain v. Ellison, 273 F.3d 56 (2nd Cir. 2001).

122.  On the many occasions that Stevens has had to be
transported from the Nemansket Correctional Center to Shattuck
hospital and back Stevens is required to endure the humiliation
of two (2) strip searches.

123.  Before Stevens is handed over to DOC transportation
officers he is required to, infront of multiple officers, remove
all of his clothing, lift his penis and testicles for inspection,
run his fingers through his hair, then run his fingers inside
his mouth and finally forced to bend over and spread his buttocks

with his hands.

124.  Stevens is then secured in hand cuffs, belly chains and leg irons, transported to another DOC secured facility where he is either under the escort of two (2) DOC employees or locked in a cell, all while wearing handcuffs, belly chains and leg irons.  Stevens is then returned to the custody of the DOC transportation officers and returned to the Nemansket Correctional Center, where he is again forced to endure another strip search.

125.  On the occasions when Stevens has been required to go to the inmate visiting room to be interviewed by:

a.  Qualified examiners for the state pursuant to M.G.L. c. 123A, section 13;

b.  Independent psychological examiners pursuant to M.G.L. c. 123A, section 14; and

c.  Attorneys assigned to defend Stevens in his M.G.L. c. 123A Sexually Dangerousness proceeding,

Stevens has been required to endure the humiliation of having to expose himself to multiple DOC employees, for the purpose of a strip search.

126.  Stevens has been subjected to these strip searches despite the fact that the Qualified Examiners are appointed by Commissioner Dennehy and the Independent Examiners are contracted by the state and are respected members of the psychological community and Stevens' attorney who is a respected officer of the court.  All positions of respect within the community that would make it highly unlikely that they would smuggle contraband into the institution.

127.  Since his confinement at the Nemansket Correctional Center, Stevens has been forced to endure the humiliation of being subjected to a strip search prior to providing a specimen

for mandatory urinalysises. At the NCCI, Stevens was allowed to retain, at least a modicum of dignity during mandatory urinalysises in that he was able to remain fully clothed while urinating into the cup.

128.   The strip search policy enforced at the Nemansket Correctional Center is the same strip search tactics applied to the highest security criminals housed by the DOC.

## COUNT IX - WAIVER OF CONFIDENTIALITY

129.   The defendants have refused to provide Stevens with further sex offender treatment, unless Stevens agrees to waive his Fifth Amendment right not to incriminate himself and to have his communications with a social worker or psychotherapist remain confidential as provided by M.G.L. c. 112, section 135A, M.G.L. c. 233, section 20B, and the Health Insurance Partability Administration Act, 42 U.S.C. 1320d-1 to 1320d-8

## COUNT X - FAILURE TO PROVIDE TREATMENT

130.   To be detained or committed as a sexually dangerous person as defined by M.G.L. c. 123A, section 1, Stevens and all other prisoners at the Nemansket Correctional Center must have a mental abnormality or a personality disorder which "makes the person likely to engage in sexual offenses if not confined to a secure facility."

131.   Stevens is facing civil commitment of one (1) day to life at the Nemansket Correctional Center. The duration of the commitment is contingent upon Stevens' ability to successfully complete a program of treatment that will make it unlikely that he will commit sexual offenses if released.

132. The defendants are not and will not provide treatment for Stevens or any other prisoner at the Nemansket Correctional Center which substantially conforms to accepted professional judgement and practices or standards.

133. There is a clear consensus among professionals involved in the treatment of sex offenders that there is no cure for sexual predation. Brief for the Association for the Treatment of Sexual Abusers, Amicus Curia, in Kansas v. Crane, 534 U.S. 407 (1997).

134. There is no significant correlation between receiving sex offender treatment and reduced recidivism by sex offenders. Hanson, K.R. and Brussiere, M.T. (1998) Predicting Relapse: A Meta-Analysis of sexual offender Recidivism, Journal of Consulting Psychology, 66, 348 - 362.

135. The sex offender treatment program offered by the defendants to prisoners still serving their prison term, and partially completed by Stevens, can be completed in four years. For prisoners committed to the Nemansket Correctional Center the same treatment becomes interminable, with the average length of time spent at the Nemansket Correctional Center being 17 years, often without the defendants or their agents ever certifying that the prisoner has completed treatment.

136. As a prerequisite to treatment at the Nemansket Correctional Center, the defendants insist that Stevens repeat earlier, successfully completed, phases of treatment.

137. On information and belief the defendants have kept no statistics or other evidence, and have not published or otherwise disseminated any statistics or evidence of the

effectiveness or lack of effectiveness of the treatment offered and received by Stevens while in their custody.

138.   The defendants and/or their agents have never disclosed to Stevens the risks and/or benefits of participation in the sex offender treatment program, so that Stevens can make an informed decision as to whether to participate in the program.

139.   On information and belief, many or all of the staff employed by the defendants to provide sex offender treatment to Stevens and other prisoners are not professionally qualified or competent to do so.

140.   The provider of sex offender treatment for the defendants Forensic Health Services, Inc., has a major conflict of interest in providing sex offender treatment under contract to the defendant on a per capita basis, while at the same time determining which prisoners will be recomended for release from Nemansket Correctional Center, and which prisoners will be committed to it in violation of M.G.L. c. 268A, which prohibits any state contractor from participating in decisions in which the contractor has a financial interest.

## COUNT XI - CLASSIFICATION

141.   Prior to being imprisoned at the Nemansket Correctional Center, Stevens received a point based score under the defendants' classification system which would have classified Stevens to be placed in a minimum security facility. However, the defendants have arbitrarily determined that no sex offenders shall be placed in a minimum security prison or work release program.

142.   The Nemansket Correctional Center is the sole institution for prisoners imprisoned under M.G.L. c. 123A,

"and therefore it must encompass all levels of security within one facility." King v. Greenblatt, supra at 28. Stevens is imprisoned at the Nemansket Correctional Center and is subject to the same high security procedures as apply to other prisoners who have long histories of escapes, violence, murder and rape, including rape while in prison or in the Nemansket Correctional Center.

143. Also imprisoned with Stevens at the Nemansket Correctional Center are prisoners who are blind, paraplegic, elderly, infirm and suffering from profoundly disabling mental illness.

144. There is no system of classification at the Nemansket Correctional Center to provide different levels of security for different catagories of prisoners.

145. An important element of sex offender treatment is to have a community access plan (CAP) which offers controlled access to the community. King v. Greenblatt, supra at 131.

146. Should Stevens be committed to the Nemansket Correctional Center as a sexually dangerous person, a community access plan will not be available to him as there is no such program in operation at the Nemansket Correctional Center.

## COUNT XII - RELIGIOUS FREEDOM

147. In 2001 Stevens, who has been a practitioner of the Wiccan religion, was presented with a Medicine Bag by Elders of the Wiccan faith and Elders of the Native American faith who represented the Circle at NCCI. The Medicine Bag was presented as a token of fellowship and thanks for work Stevens had done for both groups while at NCCI.

148.   Stevens had the Medicine Bag in his possession when processed into the Nemansket Correctional Center.

149.   On August 18, 2004 Stevens' cell was shaken down by defendant Moreton.

150.   Stevens was prevented from observing the shake down due to Moreton hanging a towel over the window in the door.

151.   During the shake down Moreton opened the Medicine Bag by breaking or cutting the strings closing it, there-by destroying the Medicine Bag.

152.   Moreton later told Stevens that he (Moreton) had dumped the contents of "the bag" on the floor of the cell because, he claimed, he did not know what "the bag" or its contents were, there-by desecrating the contents of the Medicine Bag.

153.   Specific policies have been promulgated by the DOC governing Medicine Bags including; size, shape, material and color.   Even the contents are limited to DOC approved materials. These policies were enacted as a result of litigation against the DOC, just so the religious rights of prisoners would not be violated in this manner.

154.   Stevens wrote R.Murphy in an effort to have the policies made available to security officers at the Nemansket Correctional Center so incidents like this would not recur, and was informed that no action would be taken.

155.   Stevens grieved the actions of Moreton and asked that the Medicine Bag and its contents be replaced.   The grievance was returned denied.   Stevens appealed the decision to R.Murphy who denied the appeal.

156.   Since his incarceration at the Nemansket Correctional

Center, Stevens has written several letters and submitted several Religious Request Forms to defendant Hallett in an attempt to resolve issues regarding Stevens' practice of the Wiccan religion and to obtain items that would facilitate said practice. All of the items requested by Stevens were available to him at NCCI.

157. The defendant, Hallett, has taken no action to rectify or curb current practices which infringe on Stevens' First Amendment right to practice his religion and not be discriminated against for doing so, nor has Stevens received any response to the Religious Service Request Forms which he has submitted per DOC policy.

## COUNT XIII - FOOD SERVICE

158. Since his incarceration at the Nemansket Correctional Center, Stevens has observed numerous violations in the preparation and service of food, food storage and handling, as well as unhealthy conditions in the inmate dining room (IDR).

159. The three (3) week cycle of food served at the Nemansket Correctional Center is the same menu that is served at all other prisons, whose conditions are designed to punish, operated by the DOC. Despite the defendants having been presented with copies of the menu being served a three (3) other state hospitals operated by the Commonwealth of Massachusetts, including "secure mental health facilities".

160. The food prepared for consumption by prisoners at the Nemansket Correctional Center, if prepared in the manner prescribed by the DOC nutritionist in the Food Service Manual (issued bi-annually), purports to be nutritious, yet it fails to take into account the new nutritional values provided by

the U.S.D.A.

161. The food prepared for consumption by prisoners at the Nemansket Correctional Center is prepared off-site and trucked in using "box trucks" which do not control the temperature of the food. The food is held in these trucks, frequently, for long periods of time.

162. The preparation of the food, at best, is indifferent at worst is attrocious and unpalatable, which frequently further denies Stevens a proper daily nutritional intake.

163. Stevens has grieved the failure to provide proper daily nutritional requirements. No appreciable difference has been observed in the food served.

164. The majority of the menu served at the Nemansket Correctional Center is prepared at the DOC "warehouse" leaving no accountability for mistakes in preparation, or drastic deviations from recipies created by the DOC nutritionist. The portions are frequently incorrect in size, according to the Food Service Manual, and are excessively high in carbohydrates.

165. Stevens is frequently served meals at temperatures outside the safe levels which the Centers For Disease Control has identified as a common factor for food borne illness. The temperatures are also not compliant with the state codes, promulgated by the Department of Health which govern temperatures at which food is to be stored and served, as covered in the minimum standards for food establishments.

166. Stevens has grieved the violation of food storage and service temperature regulations, citing the lack of properly calibrated food thermometers, the broken/non-functional thermometer on the walkin cooler, as well as the inoperative

steam table in the kitchen.  No action has been taken by the
defendant Sears to rectify these problems.

167.   The Nemansket Correctional Center frequently operates
the dishwasher without soap, fails to provide bleach in the
sanitation sinks or buckets used to wipe tables, and allows
inmates to handle clean dishes, then dirty dishes, then clean
dishes again without washing their hands or changing gloves.

168.   Stevens has frequently witnessed cockroaches in the
dining room and on the serving line at the Nemansket Correctional
Center.  The ineffective application of pesticides has had no
effect on this problem.

169.   The seating area in the chow hall was layed out
without regard for movement of inmates inside.  Stevens has
frequently had to sit at a table with an aisle less than 12"
wide between his back and the back of another prisoner sitting
at the next row of tables, and Stevens is always forced to sit
in physical contact with the prisoners seated next to him due
to the placement of the tables.

170.   Stevens has frequently had food spilled on him as
a direct result of the placement of the tables in the chow hall,
and the overcrowding of the chow hall

171.   Defendant R.Murphy has treated complaints about food
and chowhall related issues with complete indifference, and
these problems continue to recur.

172.   As the temperature outside rises Stevens has noticed
an increase in the amount of spoiled or nearly spoiled milks
that are being served at the Nemansket Correctional Center.

173.   Stevens has frequently been served bread in the chow
hall that is spotted with mold, or at best just stale.

## COUNT XIV - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
## AND THE REHABILITATION ACT OF 1973

174. Stevens has been diagnosed as having a mental impairment that substantially limits one or more of his major life activities by requiring that he be confined to a secure mental health facility.

175. The DOC and/or the Massachusetts Department of Public Safety receive federal funds.

176. The defendants have denied Stevens and all other civilly detained and/or committed inmates the benifits and subjected Stevens to discrimination solely by reason of his disability.

177. The defendants have failed to provide Stevens with programs and services in the most integrated setting appropriate to his needs.

### COUNT XV - HARASSMENT

178. Since his incarceration at the Nemansket Correctional Center Stevens has been subjected to the verbal abuse and belittlement by DOC correctional officers.

179. These attacks have run the gamut from verbal assult to threats of continued incarceration at the Nemansket Correctional Center to the intentional dissemination of false information.

180. Stevens has grieved several of these incidents and they have been denied or unanswered by the defendant R.Murphy.

### CAUSES OF ACTION

181. The defendants have violated Stevens' rights to substantive due process of the law under the Fourteenth Amendment to the United States Constitution, and his rights under M.G.L.

c. 123A, section 6(a), by holding Stevens in conditions of confinement which far exceed the least restrictive alternative and which are subsequently more restrictive than the punitive conditions of confinement under which Stevens was held while still serving his prison sentence. Stevens is entitled to damages and injunctive relief against the defendants pursuant to 42 U.S.C. 1983 and declaratory and injunctive relief pursuant to M.G.L. c. 231A.

182. If the Nemansket Correctional Center is a "secure mental health facility not a correctional facility" as the Massachusetts Supreme Judicial Court has ruled in Commonwealth v. Knapp, 441 Mass. 157, 168 (2004), then the minimum standards of fitness for human habitation set out in 105 CMR 410 apply, and Stevens is entitled to injunctive relief to enforce the minimum standards of fitness for human habitation as provided by M.G.L. c. 111, section 127A, et seq.

183. Stevens and all other persons imprisoned at the Nemansket Correctional Center are entitled to damages and injunctive relief because the defendents have failed to provide the minimal civilized measure of life's necessities under either 105 CMR 410, et seq., or under 105 CMR 451, et seq. The State Sanitary Code's Minimum Standards of Fitness for Human Habitation.

184. The failure to apply 105 CMR 410, Minimum Standards of Fitness for Human Habitation violates the right of Stevens and all other persons imprisoned at the Nemansket Correctional Center to equal protection of the laws as guarenteed by the Fourteenth Amendment to the United States Constitution and entitles Stevens to damages and injunctive relief pursuant to 42 U.S.C., section 1983.

185.  As applied to Stevens and all other persons imprisoned
at the Nemansket Correctional Center, M.G.L. c. 123A violates
Stevens' right to substansive due process.  As applied the
statute is not narrowly tailored to further a legitimate and
compelling governmental interest.  The conditions of confinement
at the Nemansket Correctional Center are indistinguishable,
and in many cases more punitive than those of prison.  By design
the defendants have mandated that the same regulations apply
to both the Nemansket Correctional Center and all other prisons
of the Department of Correction.  In practice the conditions
of confinement at the Nemansket Correctional Center are
substantially more restrictive than the prison in which Stevens
was held prior to the start of M.G.L. c. 123A proceedings.
Although the courts have ended the conditions which were barbaric
and inhumane at the Nemansket Correctional Center in the 1970s,
the conditions of confinementt still are no better than a poorly
run prison.  (See King v. Greenblatt, supra, for a description
of the appalling conditions which existed at the Nemansket
Correctional Center in the 1970s.)  The defendants continue
to ignore major components of prior court orders, including
failing to implement a classification system and least restrictive
non-punitive conditions of confinement.  With the reenactment
of civil commitment in September of 1999 and the resultant
substantial influx of newly committed persons, the defendants
have made no provision for adequate space for the newly committed
persons, and instead have willfully created a situation of
overcrowding in a facility that was already overcrowded by the
defendant's decision to treat state inmates using the same
facilities.  There is neither the legislative, executive nor

judicial will to implement true civil commitment.  Instead what
is called "civil commitment" is as chimerical as "seperate but
equal" and is nothing more than extended punishment.  Stevens
is entitled to damages, injunctive and declaratory relief under
42 U.S.C., § 1983, because M.G.L. c. 123A is unconstitutional
as applied to himself.

186.  Stevens is entitled to adequate treatment while being
involuntarily confined by the defendants, as a matter of
substantive due process under the Fourteenth Amendment to the
United States Constitution.  Stevens may not be forced to waive
his Fifth Amendment right against self incrimination and his
statutory rights to confidentiality in professional treatment
as a condition of receiving the treatment which he is entitled
to under the Fourteenth Amendment.  The defendants' failure
to provide adequate treatment and their attempts to compel Stevens
to waive his right to not incriminate himself and to have
confidential professional treatment violates Stevens' civil
rights and entitle Stevens to damages and injunctive relief
under 42 U.S.C., §1983.

187.  The actions of the defendants in refusing to make
Stevens copies, which he is entitled to under regulations of
the Massachusetts Department of Corrections violates Stevens'
First Amendment right of freedom of expression and to seek
redress of grievance, and Stevens' rights under the Fourteenth
Amendment access to the courts.  These violations of Stevens'
rights entitle him to damages and injunctive relief under
42 U.S.C., § 1983.

188.  Stevens is entitled to judicial review of the defendants'
grievance decisions under M.G.L. c. 127, § 38H, in accordance

with the standards set out in M.G.L. c. 30A, section 14, because
the decisions are:

    a. not supported by substantial evidence;

    b.   based on errors of law;

    c.   made upon unlawful procedures;

    d.   in excess of the statutory authority or jurisdiction
of the DOC; and

    e.   arbitrary or capricious, an abuse of discression, or
otherwise not in accordance with the law.

    189.   Stevens is further entitled to declaratory and
injunctive relief under 42 U.S.C. section 1983 and M.G.L. c. 231A
declaring that the grievance procedure followed at the Nemansket
Correctional Center, as applied to Stevens and all other prisoners
incarcerated there violates M.G.L. c. 127, section 38E.

    190.   The interference with Stevens' incoming and outgoing
mailviolates his First Amendment rights to freedom of speech
and to seek redress of grievances, and his Fourteenth Amendment
right to access to the courts, and entitles Stevens to damages
and injunctive relief under 42 U.S.C.  section 1983.

    191.   The interference with Stevens' mail also violates
his right to substantive due process of law protected by the
Fourteenth Amendment, because it is not the least restrictive
alternative and does not treat Stevens more considerately than
prisoners are treated.

    192.   The actions of the defendants in monitoring and
recording Stevens' teleohone calls violates his First Amendment
right to freedon of speech and his Fourteenth Amendment right
to more considerate treatment than prisoners entitle Stevens
to injunctive relief to stop monitoring and recording of his

telephone calls) discontinue recorded announcements throughout the calls, to remove all prior restraints on who Stevens may call and allow the use of pre-paid calling cards;  Stevens is also entitled to damages in the amount equal to the illegally collected commissions on his telephone calls paid into the General Fund, under 42 U.S.C., § 1983.

193.   The defendants have violated Stevens' clearly established rights under the Fourteenth Amendment to the United States Constitution to not be housed and transported by the defendants in a manner that is unsafe.  Stevens is entitled to damages and injunctive and declaratory relief under 42 U.S.C. § 1983.

194.   The action of the defendants in destroying Stevens' religious items and substantially burdening his religious freedom violates Stevens' clearly established First Amendment rights under the United States Constitution and entitles Stevens to damages, and declaratory and injunctive relief under 42 U.S.C. § 1983, and 42 U.S.C.A., §2000cc.

195.   Stevens' right to substantive due process of law protected by the Fourteenth Amendment of the United States Constitution is also being violated by the defendants mishandling of food, food service and food storage which effectively endangers Stevens' health, and the menu, as served to Stevens and all other prisoners at the Nemansket Correctional Center, violates Stevens' Fourteenth Amendment right to more considerate treatment than prisoners, and entitles Stevens to damages and injunctive relief under 42 U.S.C., § 1983.

## CLASS ACTION

196.   The plaintiff class consists of all persons at the

Nemansket Correctional Center who are:

A) Civil detainees;

B) Being held in conditions which are far more punitive than prison;

C) Being held in conditions of confinement which far exceed least restrictive alternative;

D) Housed in a secure Mental Health facility which does not meet the Minimum Standards of Fitness for Human Habitation;

E) Being subjected to "civil detainment" or "commitment" but as applied to the class is nothing more than an increase and continuation of the punishment for the crimes for which class members have completed their prison sentences; and

F) Who are being charged an unauthorized fee for telephone services.

## RELIEF

WHEREFORE the plaintiff requests that the court grant the following relief:

1.  The court grant actual and punitive damages for violation of the plaintiff's civil rights, together with reasonable attorneys fees as provided by 42 U.S.C., § 1983.

2.  The court grant a preliminary injunction enjoining the defendants from failing to immediately:

a)  implement the least restrictive conditions of confinement necessary for the plaintiff, which shall not be any more restrictive than the conditions of confinement at N.C.C.I. Gardner, or alternatively return the plaintiff to N.C.C.I. Gardner to be held under the same conditions of confinement under which Stevens was held immediately prior to his transfer to the Nemansket Correctional Center;

b)  remove all restrictions on telephone calls made by the plaintiff, including the manner in which the plaintiff may pay for those calls;

c) comply with the minimum standards of fitness for human habitation by immediately ending double bunking in cells with less than 140 square feet of floor area;

d) provide the plaintiff with food and clothing in a manner consistant with persons who have been civilly committed to mental hospitals because they present imminent danger to themselves or others;

e) allow the plaintiff and other prisoners at the Nemansket Correctional Center to purchase and have a computer and a printer, and other appliances which do not pose an immediate threat to employees or residents, including compact discs containing educational, legal research, and entertainment materials.

3. Grant the plaintiff damages in an amount equal to the unauthorized monitary exactions paid by the plaintiff as commissions on collect phone calls which have been paid into the General Fund of the Commonwealth.

4. Declare that M.G.L. c. 123A is unconstitutional as applied defacto to the plaintiff and all other persons civilly committed at the Nemansket Correctional Center, and order the immediate release of the plaintiff.

5. Enjoin the defendants preliminarily and permanantly from subjecting the plaintiff and all other prisoners confined to the Nemansket Correctional Center to a grievance process that does not comply with M.G.L. c.127, § 38E.

6. Enjoin the defendants preliminarily and permanantly from failing to provide copies of legal documents and reference materials, including copies of reported and unreported case decisions and sample pleadings for the benifit of the plaintiff's

and his attorney, copies of letters to public officials, copies to the press and copies of statutes and regulations, further enjoin the defendants from impeading or interfering with the use of the law library in any manner inconsistant with the least restrictive alternative appropriate to the palintiff, or inconsistant with maximizing access to the library for the plaintiff and other prisoners.

7.  Grant damages equal to the complete costs of replacing the Medicine Bag and its contents.

8.  Certify this action as class action and grant all of the relief requested above to each of the class members.

9.  Grant such further relief as justice and equity require.

10.  Grant the plaintiff perminant injunctive relief as prayed for in paragraph 2 above.

11.  Grant the plaintiff monitary damages and reasonable attorneys fees for violation of his civil rights.

William G. Stevens, Plaintiff

William G. Stevens, Pro Se
Nemansket Correctional Center
30 Administration Road
Bridgewater, MA 02324

## VERIFICATION

I, Willaim G. Stevens, state under the pains and penalties of purjury that all of the factual allegations containin the foregoing complaint are true.

July 14, 2005

William G. Stevens

JS 44
(Rev. 3/99)

# CIVIL COVER SHEE⎕

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as re
by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for t
of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

William G. Stevens

## DEFENDANTS

Massachusetts Department of Correction,
et al.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Plymouth
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Worcester
(IN U.S. PLAINTIFF CASES ONLY)
NOTE    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro Se

ATTORNEYS (IF KNOWN)

## 05-11565 JLT

## II. BASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES  (PLACE AN "X" IN ONE BOX FOR PLA
(For Diversity Cases Only)  AND ONE BOX FOR DEFENDANT

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 |  |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 |  |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 |  |

## IV.  NATURE OF SUIT  (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury — Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☒ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS — Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determinati Under Equal Access to Jus<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |

## V. ORIGIN  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

Transferred from
☐ 5 another district
(specify)

☐ 6 Multidistrict
Litigation

Appeal to Dist
Judge from
☐ 7 Magistrate
Judgment

## VI. CAUSE OF ACTION  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

The plaintiff files this complaint alleging violations of his rights protected by
the First, fifth, and Fourteenth Amendments to the United States Constitution as
well as 42 U.S.C. §§ 1320d, 1983, and 2000cc

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in compla
**JURY DEMAND:**   ☐ YES   ☐ NO

## VIII. RELATED CASE(S) (See instructions):
IF ANY

JUDGE

DOCKET NUMBER

DATE
7-21-05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____